# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
RAYMOND and DEBORAH KOLOKOWSKI    :
:
                   Plaintiffs    :    Hon. Joseph H. Rodriguez
:
        v.    :    Civil Action No. 05-4257
:
CROWN EQUIPMENT CORPORATION,    :    **Opinion**
and ABC CORPS, LMN CORPS, JANE DOES,    :
JOHN DOES, and DEF CORPORATIONS    :
(fictitious defendants)    :
                   Defendant    :
_____    :

**RODRIGUEZ**, Senior District Judge:

This matter comes before the Court on motions *in limine* filed by Plaintiffs and

Defendant pursuant to Federal Rule of Evidence 702.  On October 17, 2008, Plaintiffs

Raymond and Deborah Kolokowski[1] filed a motion *in limine* [47] to exclude the expert

testimony of John Johnson, PE, and Dan Dunlap, PE on behalf of Defendant Crown

Equipment Corporation ("Crown Equipment").  Plaintiffs therein requested a Rule 104

hearing in the alternative, and an Order granting summary judgment based on the

exclusion of Defendant's putative experts.  Additionally, Plaintiffs move for summary

judgment on his failure to warn claim.  Defendant Crown Equipment filed its own

motion *in limine* [45] on October 20, 2008, moving to exclude the expert testimony of

Richard McLay, Ph.D.  Defendant therein requested a Rule 104 hearing in the

alternative, and summary judgment based on the exclusion of Plaintiffs' putative expert.

_____

[1]      Plaintiff Deborah Kolokowski sues <u>per quod</u>.

For the reasons expressed below, the proposed expert testimony of Dr. McLay is inadmissible.  Therefore, Plaintiffs' claim against Defendant fails, and Plaintiffs' motion *in limine* to bar Defendant's experts is rendered moot.  Plaintiffs' failure to warn claim is similarly unavailing.

## I. Factual Background & Procedural History

On August 29, 2003, Plaintiff Raymond Kolokowski was operating a Crown PE 3540-60 walkie rider pallet truck.[2]  (Pl. Ex. A.)  This particular pallet truck operates in two modes; it can be driven while riding on its platform or it can be driven while walking alongside it.  (Pl. Ex. C.)  At all relevant times, Plaintiff drove the truck while walking alongside it.  (Pl. Statement of Undisputed Facts 3.)  The key events are as follows. Plaintiff was driving the pallet truck passed an isle in his employer's warehouse when he suddenly heard from his right side the sound of a back-up warning device from a material mover.  (Id.)  This sound startled Plaintiff.  Given its intensity, Plaintiff believed he was about to be hit.  (Id.)  As a result, Plaintiff sharply turned his pallet truck to the left, and captured the heel of his right foot on the bottom of the platform of the pallet truck.  (Id.)  The forward movement of the pallet truck pushed the ball of his foot into the concrete floor, which thereby resulted in a lisfranc injury to his foot.  (Pl. Ex. H.)

---

[2]    The subject pallet truck is sold by Defendant Crown Equipment.  It was manufactured on July 18, 2000 and was sold to Mr. Kolokowski's employer, United Stationers, before the injury occurred.  (Def. Ex. A.)  This particular truck is equipped with two forks for carrying palletized loads.  Its primary purpose is to lift and move palletized materials in a warehouse.  Once the truck is moving, there are two ways to apply the brakes.  (Def. Ex. C.)  First, the steering arm may be raised such that it nears perpendicular to the ground or, alternatively, it may be lowered towards the ground. Second, the operator can rotate the travel speed control handle in the opposite direction of travel.  This latter method is known as plugging.  (Id.)

2

Plaintiffs' expert acknowledges that Kolokowski stepped into the path of the pallet truck when he made this maneuver.  (Daubert Hr'g Tr. 54:12-14, hereinafter "Tr.", July 7, 2009.)  Plaintiffs' primary contention is that this maneuver was foreseeable, and that his injury could have been prevented were it not for certain design defects in the pallet truck.

The first alleged defect concerns the length of the pallet truck operating handle.[3] According to Plaintiffs, "[T]he length of the T bar was too short by 9 inches."  (Pl. Br. 2-3.)  As a result of this alleged design defect, Plaintiffs contend the heel of an operator's foot can come into contact with the underside of the pallet truck platform when the operator turns the vehicle in walking mode.  (Id. at 3.)  To correct this defect, Plaintiffs' expert– Dr. Richard McLay–proposes an alternative design.  Dr. McLay contends the T-bar handle should be lengthened by nine or nine and one-half inches.  This lengthening could be accomplished by either permanently lengthening the handle or by manufacturing the handle so that it telescopes nine inches upon putting the truck in walking mode.  (Tr. 26:12-23.)  The truck would include new membrane electronic switches which could detect whether the operator was walking or riding.  (Id.)  In any event, it is alleged that lengthening the handle would put enough space between the operator and the machine to reduce the probability of this accident from occurring again.  (Tr. 23:21-25.)

The second alleged defect concerns the gap or clearance between the bottom of the platform and the floor.  As it currently exists, this gap is five and three-quarter

---

[3]     Because the operating handle is in the shape of a "T", Plaintiffs refer to it as a T-bar.  For the sake of consistency, this Court does as well.

inches.  Dr. McLay contends this gap should be reduced from five and three-quarter to three and one-quarter inches.  (Tr. 23:8-9.)  It is alleged that this reduction would reduce the probability that an operator could wedge his or her foot between the platform and the ground.  (Tr. 23:8-14.)  It could be accomplished either by fitting the pallet truck with a polymer skirt that would wrap around the base of the platform, or by welding a new front face onto the platform.  (Tr. 21:20-25; 22:4-10.)

A third alleged defect concerns the warnings and training attendant with the walkie rider pallet truck.

> Plaintiff moves for summary judgment requesting that the Court determine that Crown's failure to provide training as part of the price of the vehicle, was a failure to provide a necessary warning and therefore a defect in the vehicle at the time it was placed into commerce.

(Pl. Br. 27.)  Thus, Plaintiffs essentially contend that Crown Equipment provided an inadequate warning because it failed to provide training, in addition to its already included user manual and warnings on the pallet truck.[4]  (Pl. Ex. C & F.)

Defendant contests both claims.  Defendant contends the walkie rider pallet truck "is safe for its intended use and complies with all applicable standards and codes."  (Def. Br. 10.)  Relatedly, Defendant vigorously contests the alternative designs submitted by Dr. McLay as baseless and speculative:

> McLay's 'expert opinion' is nothing more than a hypothesis that a longer

---

[4]     The warnings that do accompany the Crown Equipment walkie rider pallet truck state, "When walking and traveling power unit first, protect your legs and feet by staying to the side and keeping out of the path of the truck."  (Pl. Ex. F.)  A diagram depicts the recommended walking path of the operator.  (Id.)  The user manual also says, "Make certain the truck won't hit the back of your leg or foot."  (Def. Ex. D.)  Additional warnings are located directly on the pallet truck.  These warnings reference the relevant Occupational Safety and Health Administration ("OSHA") regulation and provide in part, "It's the law, you must be trained and certified to operate this truck."  (Id.)

> handle is safer because it keeps the operator farther away from the machine
> and a lower ground clearance is safer because there is less of a gap between
> the machine and the floor.  How far away is safe?  How much lower is safe?
> McLay doesn't know . . . McLay's is a strange and unreliable methodology
> that is not generally accepted by the scientific community and does nothing
> to validate and substantiate his opinions.

(Def. Br. 30.)  For the above reasons, inter alia, Defendant moves to exclude Dr. McLay

from testifying.

As for Plaintiffs' alternative failure to warn theory, Defendant highlights the

relevant OSHA regulations on powered industrial trucks.  (Def. Br. 12.)  The relevant

regulation regarding training and operation provides:

> The *employer* shall ensure that each powered industrial truck operator is
> competent to operate a powered industrial truck safely, as demonstrated by
> the successful completion of the training and evaluation specified in this
> paragraph (l).

29 C.F.R. 1910.178(l)(1) (emphasis added).  Thus, Defendant contends "[t]he burden of

training the employee falls solely on the employer and not on the manufacturer."  (Def.

Br. 12.)  Defendant then turns this argument into one for preemption, contending the

duty Plaintiffs seek to impose is preempted by OSHA.  (Id. at 13.)  Defendant

alternatively contends that it provided adequate warnings with the walkie rider pallet

truck–namely, warnings on the truck and its accompanying user manual.  (Id. at 13 n.7.)

Defendant therefore contends the issue of adequate warnings, if it is reached, is one for

the jury.  (Id.)

Some procedural history is appropriate.  This case was originally filed by

Plaintiffs in New Jersey Superior Court, Law Division, Camden County, but was

thereafter removed to the District of New Jersey, Camden Vicinage, on the basis of

diversity jurisdiction, see 28 U.S.C. § 1332, by Defendant Crown Equipment (Def. Not.

of Removal, <u>filed</u> Aug. 30, 2005.)  Plaintiffs subsequently filed a motion to remand, but

that motion was denied in an unpublished Opinion by this Court on December 6, 2005.

<u>See generally</u> <u>Kolokowski v. Crown Equip. Corp.</u>, No. 05-4257, 2005 WL332077 (D.N.J.

Dec. 6, 2005).

Currently, Raymond Kolokowski seeks compensatory and punitive damages,

attorneys fees, costs of suit and such other and further relief as the Court may deem

proper.  (<u>Id.</u> at Ex. A.)  Deborah Kolokowski also seeks to recover damages, interests,

costs of suit, counsel fees and such other relief as the Court may deem equitable and

just.  (<u>Id.</u>)  Suing <u>per quod</u>, she alleges that as a result of Kolokowski's injuries, she has

lost the past, present and future values of his usual services and consortium.  (<u>Id.</u>)

### III. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue of material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party

is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d

471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L.Ed.2d 265  (1986)); <u>accord</u> Fed. R. Civ. P. 56 (c).  Thus, this Court will enter

summary judgment only when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could

return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" if, under the

governing substantive law, a dispute about the fact might affect the outcome of the suit.
Id.  In determining whether a genuine issue of material fact exists, the court must view
the facts and all reasonable inferences drawn from those facts in the light most favorable
to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a
genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct.
2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met this burden, the
nonmoving party must identify, by affidavits or otherwise, specific facts showing that
there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.
Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for
summary judgment, the nonmoving party must identify specific facts and affirmative
evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-
57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . .
vague statements . . .' " Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating
Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d
497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof at
> trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role
is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

When a plaintiff is required to submit expert testimony to establish an essential element of his or her case, the court may grant summary judgment if that testimony is excluded under <u>Daubert</u>.  <u>Perry v. Novartis Pharm. Corp.</u>, 564 F. Supp. 2d 452, 473 (E.D.Pa. 2008).  Indeed, the Third Circuit affirmed a decision granting summary judgment after expert testimony was excluded as unreliable in a matter that required the assistance of an expert to establish the elements of the plaintiff's case.  <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136 (3d Cir. 2001).

## IV. Discussion

The Court now turns to the contentions raised by both parties.  In doing so, particular emphasis is placed on Defendant's motion *in limine* to exclude Plaintiffs' putative expert, Dr. Richard McLay.  Significantly,  "[w]here the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony."  <u>Ortiz v. Yale Materials Handling Corp.</u>, No. 03-3657, 2005 WL 2044923, *11 (D.N.J. Aug. 24, 2005) (quoting <u>Lauder v. Teaneck Volunteer Ambulance Corps.</u>, 368 N.J. Super. 320, 331, 845 A.2d 1271 (App. Div. 2004)).  Expert testimony is needed in such cases to present evidence and thereby assist the trier of fact.  <u>See</u> <u>Ebenhoech v. Koppers Indus., Inc.</u>, 239 F. Supp. 2d 455, 468 (D.N.J. 2002).  Without it, Plaintiffs' case will lack the necessary proofs for trial.  This issue consequently becomes a threshold issue.

8

## A. Federal Rule of Evidence 702 and <u>Daubert</u>

The guiding principles that inform the Court's judgment are found in Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Consistent with that Rule, <u>Daubert</u> established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. <u>See</u> <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003).[5]  This "trilogy" consists of "qualification, reliability and fit."  <u>Id.</u>  The Third Circuit liberally construes the qualifications of an expert, noting that "a broad range of knowledge, skills, and training will qualify a witness as an expert . . ."  <u>See</u> <u>Yarchak v. Trek Bicycle Corp.</u>, 208 F. Supp. 2d 470, 495 (D.N.J. 2002) (quoting <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994) ("<u>Paoli II</u>")) (internal quotations omitted).  As such, exclusion of an expert witness is "improper simply because an expert does not have the most appropriate degree of training."  <u>Yarchak</u>, 208 F. Supp. 2d at 495 (quoting <u>Diaz v. Johnson Matthey, Inc.</u>, 893 F. Supp. 358, 372 (D.N.J. 1995)).

With respect to reliability, the focus is on the "principles and methodology, not on

---

[5]      <u>Daubert</u> has since been expanded to include expert testimony relating to "technical or other specialized knowledge."  <u>See</u> <u>Oddi v. Ford Motor Corp.</u>, 234 F.3d 136, 146 (3d Cir. 2000) (quoting <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

the conclusions that they generate." Daubert, 509 U.S. at 595.  Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact.  See Daubert, 509 U.S. at 593.  The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community.  Id. at 593-94.  The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  Paoli II, 35 F.3d at 742 n. 8. When considering these factors, the Court's inquiry must be a "flexible one."  Id.

As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case."  Yarchak, at 208 F. Supp. 2d at 496.  The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case."  Id. (citing Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 595 (D.N.J. 2002)).  Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand."  See Calhoun, 350 F.3d at 324.

These factors are not exclusive.  They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.' " Yarchak, 208 F. Supp. 2d at 495 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)).  With the help of these guideposts, the

Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

## B. Daubert Hearing

Rule 104(a) permits a preliminary inquiry in the form of a Daubert hearing, wherein the burden of proof on admissibility of an expert is set at a preponderance of the evidence.  See Fed. R. Evid. 104(a); and Daubert, 509 U.S. at 592 n.10 (referring to Rule 104(a) and holding that such preliminary "matters should be established by a preponderance of proof.").  The Third Circuit stresses "the importance of *in limine* hearings under Rule 104(a) in making the reliability determination required under Rule 702 and Daubert."  See In re TMI Litigation, 199 F.3d 158, 159 (3d Cir. 2000) (quoting Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3d Cir. 1999)).  The importance of such a hearing is heightened when either party advances a Daubert challenge "in the context of a summary judgment motion or where summary judgment will inevitably be granted if the proffered evidence is excluded."  In re TMI Litigation, 199 F.3d at 159.  Fully aware that a "failure to hold [an *in limine*] hearing" in this context "may be an abuse of discretion", see id. (quoting Padillas, 186 F.3d at 418), this Court set aside three days for the above-mentioned Daubert challenges by way of Letter Order.  (Letter Order [Dkt. Entry No. 57], filed Feb. 18, 2009.)

The Court heard the testimony of Plaintiffs' putative expert, Dr. Richard McLay, and oral argument by both parties on Defendant's motion *in limine* to exclude Dr. McLay.  (Tr. 81-121.)  The hearing was adjourned to await the resolution of Defendant's motion.  For the reasons expressed below, Defendant's motion *in limine* is granted.

## 1. Qualifications of Richard McLay

To begin, Dr. McLay is an engineer.  (Tr. 1:24-25)  He has a Bachelor of Science in mechanical engineering from the University of Wisconsin.  (Tr. 2:2-3.)  He also has a Master's and a Ph.D. in engineering mechanics from the University of Wisconsin.  (Tr. 2:3-5.)  Dr. McLay completed his Ph.D. in 1963.  (Tr. 2:5.)  Since then, he has worked in academia and the private sector.  From 1963 until 1968, Dr. McLay worked for Boeing doing simulation work, <u>inter alia</u>, in structures and dynamics.  (Tr. 2:9-12.)  From 1968 until 1982, he taught mechanical engineering, including structures, dynamics, and simulation at the University of Vermont.[6]  (Tr. 2:13-17.)  During that time, he researched biomechanics and lectured at the University of Vermont Medical School to residents in orthopaedic surgery on injury causation.  (Tr. 2:18-21; 3:15-17.)

After academia, Dr. McLay returned to the private sector to work for General Electric ("GE").  (Tr. 2:22.)  There, he primarily did analysis, design, and test work.  (Tr. 2:22-25, 3:1-3.)  He eventually left GE and did similar work for other companies in the defense industry.  (Tr. 3:4-25.)  In 1990, Dr. McLay began forensic work full-time, (Tr. 3:4-21.), although he still moonlights as an adjunct professor at the University of Iowa.  (Tr. 4:4-5.)  Finally, he has published several papers.  One paper co-authored by Dr. McLay is titled, "Risk Analysis of Forklift Drivers."  (McLay Aff. ¶ 5.)

Dr. McLay's credentials are impressive.  There are some deficiencies, however.  For example, he was never part of a design team for a pallet truck that ultimately reached the production line.  (Tr. 49:3-6.)  He has never operated a pallet truck, (Tr.

---

[6]       Dr. McLay began as an associate professor but later became a full professor.  (Tr. 2:14-15.)

49:7-9.), nor has he been licensed to operate a pallet truck.  (Tr. 49:22-24.)  He has no

patents dealing with pallet trucks or for that matter, any material handling equipment.

(Tr. 49:10-12.)  He has not sat on an American National Standards Institute ("ANSI")

committee dealing with forklift issues.  (Tr. 49:19-21.)  With respect to this particular

accident, he is not sure of when–during the accident sequence–the truck ran over

Kolokowski's foot.  (Tr. 54:15-17.)

 Despite these deficiencies, exclusion of an expert witness is "improper simply

because an expert does not have the most appropriate degree of training." Yarchak, 208

F. Supp. 2d at 495 (quoting Diaz, 893 F. Supp. at 372).  Given the liberal construction of

the qualifications of a putative expert under Daubert in the Third Circuit, see Yarchak,

208 F. Supp. 2d at 495 (observing same), Dr. McLay is sufficiently qualified to meet the

first element of the Daubert trilogy.  Unfortunately for Plaintiffs, the inquiry does not

end after a determination that the expert is preliminarily qualified.

## 2. Reliability

 Dr. McLay theorizes that the Crown Equipment pallet jack is defective for two

reasons: (1) "its handle is too short"; and (2) "it has an improper clearance on the front."

(Tr. 38:13-14.)  Accordingly, he proposes lengthening the handle to eighteen and one-

half inches and reducing the clearance on the front of the vehicle to three and one-

quarter inches.  These changes, he opines, will lower the probability that an operator's

foot will get trapped underneath the platform of the truck.  (Tr. 23:5-25.)

 There are numerous problems attendant with the 'methodology' that supports

these alleged alternative designs.  First and foremost, Dr. McLay failed to perform any

testing on his proposed alternative designs because he did not build prototypes or mock-

13

ups.  (Tr. 77:15-20.)  While failure to test his alternative designs is not dispositive, it certainly undercuts the reliability of his opinion.  Testing demonstrates scrupulous scientific inquiry.  It also demonstrates the feasibility of the proposed alternative design.  Accordingly, courts in this jurisdiction often look to this element in the context of a Daubert challenge.  See, e.g., Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1084 (3d Cir. 1999) (finding no abuse of discretion where district court excluded testimony of expert who did not test his proposed alternative design); see also Ortiz v. Yale Materials Handling Corp., No. 03-3657, 2005 WL 2044923, at *6 (D.N.J. Aug. 24, 2005) ("[A]n expert must have good grounds for his opinion, and in the case of alternative designs, testing is crucial.") (citing Dhillon v. Crown Controls Corp., 269 F.3d 865, 870 (7th Cir. 2001)).  Other circuits also stress the importance of testing alternative designs.  See Zaremba v. General Motors Corp., 360 F.3d 355, 358-59 (2d Cir. 2004) (affirming exclusion of expert where expert did not conduct testing of his proposed alternative design); Cummins v. Lyle Indus., 93 F.3d 362, 368 (7th Cir. 1996) ("Our cases have recognized the importance of testing in alternative design cases.").

Here, Dr. McLay did two tests worthy of mentioning.  He conducted a static test with a licensed operator, and he conducted a simulation with a Yale walkie truck.  Both tests fail to pass muster, however.  With respect to the static test, Dr. McLay asked the operator to assume three positions relative to the pallet truck.  (Tr. 73:8-10.)  He then chalked his feet to "get some feel" for where the operator was located relative to the pallet truck.  (Tr. 37:1-3.)  At no time was the pallet truck turned on.  (Tr. 73:11-13.)

There are two main problems with this 'test'.  The most glaring problem is its purpose; Dr. Mclay conducted the test to "get some feel" for the interaction between the

operator and the pallet truck.  This is precisely the kind of "subjective . . . approach that cannot reasonably be assessed for reliability" that the Third Circuit cautions against.  See United States v. Mitchell, 365 F.3d 215, 235 (3d Cir. 2004) (quoting Fed. R. Evid. 702, Advisory Committee's Note).  Indeed, Dr. McLay admits the static test was performed with no knowledge of the gait of Plaintiff.  (Tr. 72:2-4.)  The second problem goes to fit, which is discussed more thoroughly below.  See discussion infra Part IV.B.3. The subject operator was holding the control handle at arms length, outside the travel path of the pallet truck.  (Tr. 72:12-23.)  During the actual accident, however, Plaintiff's expert acknowledges Plaintiff stepped into the pathway of the pallet truck.  (Tr. 54:12-14.)  Thus, while the static test may have given Dr. McLay a subjective "feel" for the machine, it did not actually recreate the accident.  Its relevance is therefore questionable at best.

In any event, after conducting the static test, Dr. McLay conducted a simulation using the Yale walkie truck.  (Tr. 38:3-7.)  The purpose of the simulation was to determine whether "it would be possible to produce a handle length long enough such that a ninety-five percentile man, the largest man you would expect to operate the machine," would not interfere with the platform of the pallet truck.  (Tr. 18:10-14.)  Dr. McLay found that if the handle was lengthened by approximately nine and one-half inches, i.e. the length of the Yale walkie truck used in the simulation, then a ninety-five percentile man would be kept out of the hazard zone of the pallet truck.  (Tr. 20:3-11.)

He reached this conclusion using the following methodology.  First, Dr. McLay looked up numbers from Pheasant's book to get the height of a ninety-five percentile male and a five percentile woman.  (Tr. 14:10-21.)  The former represents a very tall

male, the later represents a very small female.  (Tr. 24:6-11.)  He then determined the

ninety-five percentile male would be the governing factor.  At the hearing, Dr. McLay

explained why:

> He is so tall that when [he] takes a normal stride, the probability of his . . . foot intersecting . . . with the front of the machine is pretty high.  And so the design of the machine would be done based on those data from the literature, which is peer reviewed literature. . . [7]

(Tr. 14:23-25; 15:1-3.)  By observing the gait of the ninety-five percentile male, he found

that if the distance between the gait of the individual and the pallet truck was too short,

then the individual's foot would be trapped by the pallet truck.  (Tr. 17:6-7.)  He

admittedly describes the methodology behind this conclusion as "quite a simple

calculation" because it merely amounts to "subtraction".  (Tr. 17:7-10.)

Like the static tests, this methodology is questionable.  It is based on inferences

not outside the acumen of the average lay person.  Reduced to its simplest form, Dr.

McLay is essentially saying: if one walks to close to a pallet truck, his foot might get run

over.  An expert is hardly required to make this conclusion, and it by no means

necessitates the final conclusion that the vehicle is defectively designed.  Granted, Dr.

McLay injects the buzz phrase "peer reviewed" throughout his testimony.  But what is

peer reviewed is the literature–Pheasant's book of heights and averages, not his "simple

calculation" of "subtraction."  Perhaps even more troubling is the fact that Dr. McLay

admits he made no estimate of the injury rates of the Yale truck (used in the simulation)

or the instant Crown Equipment truck.  (Tr. 425-14.)  He reviewed zero information

---

[7]      He also used the Fortran program, which he describes as "simply a representation of the data found from the peer reviewed literature, . . . a means of calculation", (Tr. 15:8-10), to determine that the ninety-five percentile male would be the governing factor.

regarding Yale's experience with its walkie truck.  (Tr. 44:5-7.)  These omissions are important because the Yale walkie truck provides the basis for his alternative designs. In addition, Dr. McLay acknowledges that even with a longer handle, if the operator makes a mistake, injuries can occur.  (Tr. 44:22-24.)

This point ties in with the second major problem associated with Dr. McLay's methodology; he failed to conduct any meaningful cost-benefit analysis.  (Tr. 77:12-14.) He offers no opinion on either the additional expenses or error rate, if any, of his proposed design.  (Id.)  Nor does he provide the reduced probability of injuries resulting from his proposed design.  (Tr. 42:5-7.)  Furthermore, he fails to provide the potential negative practical consequences of lengthening the handle and reducing the ground clearance.  Once again, these omissions are important.

Cuffari v. S-B Power Tool Co., is illustrative.  See 80 Fed. Appx. 749, 751, 2003 WL 22520411 (3d Cir. Nov. 7, 2003).  There, the Third Circuit affirmed this Court's exclusion of an expert who failed to conduct the cost-benefit analysis of adding an electric brake to a circular saw.  Id.  The Third Circuit reasoned, "It does not follow that just because electric brakes may shorten the coasting time of the saw blade, any saw without an electric brake is defectively designed.  A cost-benefit analysis should have been conducted to determine whether an electric brake is practical."  Id.  Similarly here, it does not follow that just because a longer handle will increase the distance between the operator and the truck, or a rubber skirt will lower the gap between the platform and the floor, that any pallet truck without such designs is defective.

Yet, Dr. McLay contends otherwise.  When asked whether a similarly designed Raymond walkie rider truck is defective, Dr. McLay answered, "Yes, it would allow

somebody to interfere with the hazard. . ." (Tr. 67:12-25; 68:1.)  When asked whether a

similarly designed *Yale* walkie rider truck is defective, Dr. McLay answered, "It would

appear that your foot could intersect the hazard, yes, on that particular machine."  (Tr.

70:15-25; 71:1.)  Defense counsel pressed Dr. McLay on this point during the hearing:

> Q.    Can you identify any walkie rider pallet truck in production that has
> a handle length that in your view would be safe?

> A.    I don't know.  I can't do it.

(Tr. 71:2-5.)  This testimony is troublesome.  Industry standard is yet another factor in

this Court's Daubert analysis.  See Meadows v. Anchor Longwall and Rebuild, Inc., 306

Fed. Appx. 781, 788 (3d Cir. Jan. 13, 2009) (observing evidence of industry practice is

useful in evaluating reliability in cases where technical issues like engineering arise

(citing Pineda v. Ford Motor Co., 520 F.3d 237, 248 (3d Cir. 2008))).  Here, industry

standard counsels against the admission of Dr. McLay's testimony because no walkie

rider trucks use a longer handle–or even a telescoping handle–like the one he suggests.

An additional problem is the exemplar used by Dr. McLay in his simulation.  As

noted above, Dr. McLay analyzed a Yale *walkie* truck, not a *walkie rider* truck like the

one involved in the underlying accident.  (Tr. 46:18-21.)  Such a truck only allows for

driving in the walking mode, unlike the instant walkie rider truck, which can be driven

in either the walking or riding mode.  If form follows function, then common sense

dictates a vehicle used only for walking may be designed differently from a vehicle

designed for walking *and* riding.  Dr. McLay admits as much.  (Tr. 68:4-16.)

Nevertheless, he failed to conduct a functionality test of a walkie rider truck with a

longer handle and reduced platform-to-floor clearance.

Next, peer-reviewed literature is conspicuously absent on a walkie rider truck equipped with the type of handle suggested by Dr. McLay.  The following is a key excerpt from cross-examination:

Q:      You told the Court that you have reviewed patents?

A:      Yes, for devices.

Q.      Right.  And am I correct, Dr. McLay, that the concept of having a handle of the length that you've said the Crown truck should have is not documented anywhere with respect to the design of a walkie rider pallet jack?

A:      Not that I know of, no.  I would say the only one, of course, was the Yale walkie in which there is documentation and the reason given.

Q:      And that's a walkie truck?

A:      That's correct.

Q:      Not a walkie rider truck, correct?

A:      That's correct.

. . .

Q.      As far as you're aware, there has been no peer review of the concept of having a handle on a pallet jack walkie rider truck of the length that you say the crown truck should have had?

A.      Well, I suppose you can say that the Yale truck is there and the simulation, which is based on the peer reviewed literature, is there, so it's peer reviewed.

Q.      Well - -

A.      That concept is peer reviewed.

Q.      But my question deals specifically with peer review of a handle of that length on a walkie rider pallet truck.

A.      No, I don't know of any design that's been done on that, that's true.

19

(Tr: 46:5-17; 47:1-13.)  The Supreme Court recognizes the importance of peer reviewed literature.  "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."  Daubert, 509 U.S. at 594 (citing J. Ziman, Reliable Knowledge: An Exploration of the Grounds for Belief in Science 130-133 (1978); Relman & Angell, How Good is Peer Review?, 321 New Eng. J. Med. 827 (1989)).  Here, the dearth of peer reviewed literature counsels against the admission of Dr. McLay as an expert.  No patents or peer reviewed literature relating to walkie rider trucks discuss the alternative designs proposed by Dr. McLay.  Additionally, his methodology is not susceptible to peer review because it relies on inferences and simple arithmetic alone.  Dr. McLay's claim of feasibility for a long handle, for example, rests solely on review of patents for long handles on walkie pallet trucks with functions different from the instant one.  (Tr. 76:9-18.)

As for the proposed polymer skirt design, once again Dr. McLay has failed to build a prototype or do a mock-up.  Just like his proposed telescoping handle, it is an alternative design that exists only in theory.  For example, Dr. McLay is unsure of the particular polymer that would best suit a walkie rider pallet truck.  (Tr. 61:21-25.)  He theorizes, "[Y]ou'd have to pick the material probably with a modulus of the rubber as high as you could get it . . ." (Tr. 62:10-12.)  He further theorizes:

> Well, the designer would have to design that skirt so that it had enough structure that it would push the foot rather than collapse under the machine, it's a design concept obviously.  And you need a fairly stiff rubber in order to do that and a large cross-section to do that, that's a matter of experimenting in designing the machine.

(Tr. 21:13-18.)  This speculative testimony typifies the opinions offered by Dr. McLay.

20

Much like the idea of lengthening the handle, the idea of reducing the gap between the platform of the vehicle and the floor stems primarily from a comparison with the functionally dissimilar Yale walkie truck:

> Q.     So, is it fair to say with regard to the issue of platform height, what you did is, you measured the Crown truck and got a measurement of five and three-quarter inches; you measured the Yale truck and got a measurement of three and one quarter inches? Is it fair to say that's all the analysis you did with regard to the platform height?
>
> A.     Yes.
>
> Q.     You just took those two measurements?
>
> A.     Yes.
>
> Q.     And is it your opinion that the platform height of three and a quarter inches renders the platform height safe?
>
> A.     Well, it will reduce the probability of injury. It would be difficult to wedge the foot underneath that dimension.

(McLay Dep. 168:7-25; 169:1-2, Feb. 18, 2008.) Dr. McLay consistently says his designs will reduce the probability of injury, but does not quantify that probability.

This troubling methodology is overly simplistic and far too inferential to warrant admission. Indeed, Dr. McLay and Plaintiff's counsel acknowledge the mere common-sense underpinnings of his conclusion. During Dr. McLay's February deposition, for example, he candidly said, "[Y]ou don't have to be an engineer to see" that a longer handle gives "more clearance." (McLay Dep. 118:13-18) (alteration in original). The same goes for his rubber skirt alternative design. At the Daubert hearing, Dr. McLay testified, "[A] *simple analysis* tells us that . . . the foot would be trapped with a higher clearance but not with a lower one." (Tr. 63:19-21) (emphasis added). Plaintiff's counsel is in agreement.

21

I mean, *we're just using sheer logic* with no -- I hate to just use logic because it's not founded on empirical facts.  But if you fall down and there's a vehicle coming at you that has over a five-inch opening, I would imagine there's going to be a greater risk of danger than if you're impacted by a vehicle that has a three-and-a-half inch.

(Tr. 105:2-8) (emphasis added).  "Sheer logic" and "simple analysis" are insufficient to form an acceptable basis of an admissible expert opinion.  In a similar case, a court sitting in this district excluded an expert with similarly unsubstantiated opinions:

[The expert's] simple review of the numbers in the chart, which does not incorporate any kind of statistical or mathematical analysis, offers no substantial support for his opinion that operators are safer staying inside a forklift rather than jumping out during a lateral tip-over, and that a stand-up forklift should come equipped with a rear door and a warning.  It is clear from Sevart's testimony during the hearing that he employed no special skill or technique different from a layperson in forming his opinion and conclusions regarding forklift safety.

Ortiz, 2005 WL 2044923, *7.  Ortiz is strikingly on point.  For example, Dr. McLay readily admits the absence of statistical analysis informing his opinion.

Q.   [Y]ou also told us that you deny that there's any statistical component to your opinion in this case.

A.   That's correct, I can't put a probability of injury onto it because I don't have the data, I just know it's very small with a longer handle, and that's the best I can do.

(Tr. 43:10-14.)

For the foregoing reasons, Dr. McLay's opinions are unsupported by reliable methodology.  His testimony lacks the good grounds or analytical rigor sufficient to validate his conclusions.  See Daubert, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation. . .").  While the analysis could stop here, for the sake of completeness, the 'fit' prong of Daubert is examined below.

### 3. Fit

In order to fit, the "testimony must in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." See Yarchak, 208 F. Supp. 2d at 496 (quoting Magistrini, 180 F. Supp. 2d at 595).  Here, there are two major problems with Dr. McLay's testimony that make it a poor fit for this case.  First and foremost, Dr. McLay acknowledges that injuries could still occur even with his alternative designs.  This fact stems from the inherent danger of pallet jacks.  (Tr. 40:15-18.)  Because he has done no research or studies on the practical effects of his alternative designs, he has no idea what type of injuries may result from their incorporation.

> Q.    You could experience a different injury with a Crown platform that was lower in height, correct?
>
> A.    It's possible.
>
> Q.    And what you don't know is you don't know what the injury severity would be without doing the study?
>
> A.    That's correct.

(Tr. 64:15-20.)

The second problem concerns the application of his knowledge and expertise to the instant case.  Admittedly, Dr. McLay possesses relevant expertise.  But like the proposed expert in Calhoun v. Yamaha Motor Corp., U.S.A., "he failed to apply this expertise to the matter at hand." See 350 F.3d 316, 324 (3d Cir. 2003).  Calhoun involved the death of a young girl due to a jet ski accident.  Id. at 318-19.  An expert with experience in naval architecture and marine engineering was prepared "to testify that the accelerating mechanism was unsafe because it resembled a bicycle brake and that Yamaha's warnings were inadequate." Id. at 323-24.  Affirming the district court's

23

exclusion of the expert, the Third Circuit observed that the expert had never operated a jet ski and, by the time of trial, had only managed to ride a different model." Id. at 324.

Such is the case here. Dr. McLay has never operated the instant walkie rider pallet truck, and the vast majority of his analysis stems from a dissimilar walkie truck produced by a different company. He neither knows where the key goes, nor what speed can be reached in either the walking or driving mode. (55:13-14; 56:2-7.) In sum, his testimony raises more questions than it answers. As a result, it cannot possibly assist the jury in making a reasoned decision of the case. His proposed testimony simply does not fit. For the foregoing reasons, the testimony of Plaintiffs' expert Dr. Richard McLay is inadmissible. Defendant's motion *in limine* is therefore granted.

### C. Summary Judgment & Plaintiffs' Product Liability Claims

In New Jersey, "[t]he Product Liability Act governs 'any claim or action . . . for harm caused by a product, irrespective of the theory underlying the claim, except actions for . . . breach of an express warranty.' " Levey v. Yamaha Motor Corp., 361 N.J. Super. 312, 318, 825 A.2d 554 (App. Div. 2003) (quoting N.J. Stat. Ann. §2A:58C-1(b)(3)). To succeed on a claim, a plaintiff must establish that the product was defective, that the defect existed when the product left the manufacturer's control, and that the product was the proximate cause of the plaintiff's injuries, a reasonably foreseeable or intended user. See Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J. Super. 320, 331, 845 A.2d 1271 (App. Div. 2004); see also Ebenhoech v. Koppers Industries, Inc., 239 F. Supp. 2d 455, 469 (D.N.J. 2002). "[W]here the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony." Ortiz, supra, at *11 (citing Lauder, supra, at 331). Expert testimony distills the complex

"mechanical intricacies of the instrumentality" so a jury can make a reasoned decision in a case. See Ebenhoech, 239 F. Supp. 2d at 468 (quoting Rocco v. N.J. Transit Rail Operations, 330 N.J. Super. 320, 341, 749 A.2d 868 (App. Div. 2000)). Relevant here, expert testimony is "generally needed as proof of an alternative warning and a reasonable alternative design. . ." Ebenhoech, supra, at 468.

This Court has already ruled on one occasion, albeit in an unpublished opinion, that a forklift constitutes a complex instrumentality. See Millan v. Crown Equipment Corp., No. 00-4831 (D.N.J. Apr. 15, 200) ("The average juror has not operated such a complex piece of machinery and cannot be expected to analyze the potential defect without the assistance of an expert."). At least one other court in this district has held the same. See Ortiz, supra, at *11 ("The instrumentality at issue in this case, a forklift, is a complicated piece of equipment that consists of many intricate mechanical parts. Therefore, a jury would not be able to simply look at its design and determine whether or not it was defective. Rather, an expert's testimony is necessary. . ."). In light of this precedent, the Crown Equipment walkie rider pallet truck easily constitutes a complex instrumentality. Expert testimony is needed, therefore, to assist the jury in making a reasoned determination on the issue of product defect.

Plaintiffs cannot satisfy this requirement because Dr. McLay's testimony is inadmissible. Absent his testimony, Plaintiffs cannot present evidence "that the product was defective" in its design. See Lauder, supra, at 331. Plaintiffs have submitted no other evidence to support its design defect theory. Summary judgment is therefore appropriate. See Milanowicz, 148 F. Supp. 2d at 541-42 (granting summary judgment on design defect and failure to warn claims after excluding the plaintiff's expert)

(citations omitted).

As for Plaintiffs' failure to warn claim, that claim is similarly unavailing. Plaintiffs move for summary judgment because, in their view, "Crowns [*sic*] failure to provide training as part of the price of the vehicle, was a failure to provide a necessary warning and therefore a defect in the vehicle at the time it was placed into commerce." (Pl. Br. 27.)  Plaintiffs contend the law in New Jersey is clear on this point, therefore judgment as a matter of law is appropriate.  (Id.)  Despite this assertion, Plaintiffs cite no case supporting the existence of a duty on a manufacturer to train the ultimate users of its products in an industrial setting.  Indeed, at least one New Jersey case suggests the opposite.

The relevant portion of the New Jersey Product Liability Act provides:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used.

N.J. Stat. Ann. §2A:58C-4.  This statute imposes on a manufacturer a duty "to take reasonable steps to ensure that appropriate warnings for safe use reach foreseeable users of the equipment."  See Grier v. Cochran Western Corp., 308 N.J. Super 308, 317 705 A.2d 1262 (App. Div. 1998).  In Grier, the New Jersey Appellate Division opined:

> What a manufacturer may be reasonably required to do in order to transmit information to a consumer/user of a product may be quite different from what is required of a manufacturer of a product intended for use by many people over an extended period of time in an industrial environment.

Id. at 317.  Although training may constitute appropriate warnings for "sophisticated, multi-functional workplace machinery", see Grier, supra, at 318, the appellate court

26

stopped short of categorically imposing a duty to train employees on manufactures. Instead, the court further opined:

> Reliance on supervisors and managers to become apprised of safety hazards and to retransmit these warnings orally to workers rather than the individual reading of a product warning, is a typical method by which information is disseminated in the modern workplace.

Id. (citations and internal quotations omitted).  In light of this reasoning, the court found the plaintiff's "contention that, as a matter of law, a manufacturer may not discharge its duty to warn by alerting the employer of the dangers in the operation of sophisticated machinery" to be incorrect.  Id.

Here, there is an OSHA regulation that affirmatively places the duty to train operators of powered industrial trucks on the employer.  See 29 C.F.R. § 1910.178 ("The employer shall ensure that each . . . operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this paragraph (1)").  Compliance with this regulation is mandatory as demonstrated by the use of the word "shall".  Id.  In addition, contrary to Plaintiffs' contention that employers lack incentives to train their employees, (Pl. Br. 30), employers have every incentive to train their employees properly.  Goals of increased productivity and efficiency are paramount in any workplace setting.  By ensuring that employees are properly trained, employers can feel confident that they positively impact their bottom line.  Moreover, unlike the manufacturer, employers have the capacity to discipline their employees for failure to attend training sessions.  See Victor E. Schwartz & Russell W. Driver, Warnings in the Workplace: The Need for a Synthesis of Law and Communication Theory, 52 U. Cin. L. Rev. 38, 71-2 (1983).

27

Employers also have "a closer relationship and more credibility" with their employees than a "remote product manufacturer." Id. at 63. Given the foregoing, and considering the consistent turnover of employees over time, this Court is unwilling to find that Crown Equipment had a duty to provide training as part of the purchase price of its walkie rider pallet trucks.

Fortunately, the Court need not rule on this issue because as a matter of law, Plaintiff cannot satisfy the element of proximate cause on his failure to warn claim. "A plaintiff asserting a cause of action based on failure to warn must establish all the same elements required for an action based on a defective product." Mathews v. Univ. Loft Co., 387 N.J. Super. 349, 362, 903 A.2d 1120 (App. Div. 2006) (quoting London v. Lederle Labs., 290 N.J. Super. 318, 326, 675 A.2d 1133 (App. Div. 1996) aff'd as modified by Batson v. Lederle Labs., 152 N.J. 14, 702 A.2d 471 (1997)). One critical element is proximate cause. See London, supra at 326-27. Here, Plaintiff expressly admits that no training would have helped him avoid this accident. The following colloquy occurred during Plaintiff's deposition:

> Q.   In your mind, is there some training that would have helped you avoid this accident occurring?
>
> A.   *Honestly, no.*

(Kolokowski Dep. 178:8-11, Feb. 21, 2006) (emphasis added). Thus, even if the Court were to find that Defendant had a duty to train employees, Plaintiffs' claim would still fail because they fail to establish that the pallet truck was rendered unreasonably safe due to the lack of a training course incorporated as part of the purchase price. According to Plaintiff's contentions, training would not have made a difference. As a result, summary judgment is appropriate.

A failure to warn claim met a similar fate in the Western District of Washington. In Stepp v. Takeuchi Mfg. Co. (U.S.) Ltd., a district court granted summary judgment on a failure to warn claim where the plaintiff admitted consistent warnings would not have altered his actions on the day of the accident.  See 2008 WL 4460268, at *7 (W.D. Wash. Oct. 2, 2008).  There, evidence showed inconsistent warnings located on an excavator and in its accompanying user manual.  See Stepp, supra, at *7.  This inconsistency formed one basis of the plaintiff's failure to warn claim.  Id.  Finding the plaintiff failed to create a genuine issue of material fact as to whether the inconsistency was the proximate cause of his injury, the court observed the following admission by the plaintiff during his deposition:

> Q.    If you had seen a warning on the excavator that said, 'Maximum side inclination angle 10 percent.  Use extreme caution when operating across slopes and on uneven terrain.  If side angle is greater than 10 degrees, machine can roll over'—if you'd seen that warning on the machine, would you have done anything differently on the day of the accident?
>
> A.    I don't think so.

Id.  The court accordingly granted summary judgment.  While Stepp is by no means binding, its analogous circumstances counsel in favor of this Court's ruling today.[8]

---

[8]    Because the Court grants summary judgment on the issue of proximate cause, it does not address Defendant's preemption argument.

29

## V. Conclusion

For the foregoing reasons, Defendant's motion *in limine* to exclude Plaintiffs'
expert is granted.  Dr. Richard McLay's testimony is inadmissible because it fails the
reliability and fit prongs under <u>Daubert</u>.  Because Plaintiffs' expert is excluded, Plaintiffs
are unable to present evidence with respect to their design defect theories.  Defendant's
motion for summary judgment is therefore granted.  As for Plaintiffs' failure to warn
claim, summary judgment is granted in favor of Defendant.  Plaintiffs fail to create a
genuine issue of material fact as to whether any training from Defendant Crown
Equipment would have prevented this accident.  Because Plaintiff Deborah Kolokowski's
consortium claim is derivative of Plaintiff Raymond Kolokowski's claim, that claim must
be dismissed.  Plaintiffs' motion *in limine* is rendered moot.  An appropriate Order shall
follow.


<u>/s/ Joseph H. Rodriguez</u>
Joseph H. Rodriguez
U.S.D.J.


Date: August 27, 2009